[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-12691
_____

D. C. Docket No. 01-00780-CV-J-W

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 2, 2006
THOMAS K. KAHN
CLERK

LUTHER JEROME WILLIAMS,

Petitioner-Appellant,

versus

RICHARD F. ALLEN,
Commissioner, Alabama Department
of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(August 2, 2006)

Before BIRCH, DUBINA and BARKETT, Circuit Judges.

DUBINA, Circuit Judge:

Petitioner, Luther Jerome Williams ("Williams"), a death row inmate,

appeals the district court's order denying him federal habeas relief pursuant to 28

U.S.C. § 2254.  For the reasons that follow, we affirm the district court's order.

## I. BACKGROUND

A. *Facts*

The facts are taken verbatim from the opinion of the Alabama Court of

Criminal Appeals on Williams's direct appeal.

> On January 22, 1988, a 1981 dark blue Oldsmobile
> Regency automobile was stolen from a motel parking lot
> in Birmingham, Alabama.  In the trunk of this vehicle
> was, among other items, a .22 caliber pistol.  A dark blue
> car arrived at the Smithfield housing project in
> Birmingham later that same evening and the appellant
> was identified as the sole occupant.  On the morning of
> January 23, 1988, John Robert Kirk was on his way
> home from work.  He stopped his vehicle – a red 1984
> Chevrolet pickup truck with a camper on the back – near
> the West Blocton exit on Interstate 59 South in
> Tuscaloosa County.  The appellant and two men were
> traveling south on Interstate 59 in the stolen Oldsmobile.
> After noticing the victim's vehicle beside the road, they
> stopped and confronted him.  The appellant led the
> victim to a nearby wooded area and shot him once in the
> left side of the head, 'execution style,' with the .22
> caliber pistol which had been in the trunk of the stolen
> Oldsmobile.  The victim's body was left at the site of the
> shooting, and his money and vehicle were taken.
>
> Later that same morning, several witnesses identified the
> appellant as the driver of a red 'camper truck' which was
> parked at the Smithfield housing project.  One of these

2

witnesses, Priscilla Jones, a relative of the appellant's, testified that the appellant had visited her on the day of the murder.  She stated that the appellant told her that 'he had killed a white man and stole his truck,' and that he proceeded to show her the weapon, which she described as having a white handle.

On the night of January 24, 1988, after responding to a call placed by a Rosie Mims, members of the Birmingham Police Department interviewed Priscilla Jones regarding the appellant.  During this interview, the Birmingham police learned of the appellant's statement to Ms. Jones concerning the shooting of a white man.  They were also informed that he was staying at an apartment in the housing project, and that he was an escapee from the supervised intensive restitution (SIR) program.

During the very early morning hours of January 25, 1988, after verifying that the appellant had indeed escaped from the SIR program and that a warrant was still outstanding, the Birmingham police went to the apartment in the Smithfield housing project where the appellant was reportedly staying.  The officers talked with the lessee of the apartment, Margie Bush.  They inquired as to the whereabouts of the appellant and his girlfriend, Debra "Bootsie" Bush.  Margie Bush turned toward a curtain which separated the front of the apartment from the back bedroom and shouted for Bootsie, who then appeared from behind the curtain. Bootsie stated that she did not know where the appellant was at that time.  However, one of the officers happened to look behind the curtain and saw the appellant lying in the bed.  After a struggle, the appellant was taken into custody.

The supervising officer then informed Margie Bush that the appellant was thought to have a gun and requested

permission to search the apartment for it. Margie Bush gave her permission. During the search, Bootsie stated that the appellant had hidden the gun in the bedroom. The murder weapon was found inside a black purse located on top of a dresser in the room in which the appellant was apprehended.

The appellant was indicted on April 29, 1988, for the murder of John Robert Kirk during a robbery. After his indictment, the appellant was sent at his own request to the Taylor Hardin Secure Medical Facility for an evaluation of his mental competency to stand trial. Evidence was presented at trial that while at Taylor Hardin, the appellant made the statement 'I have killed one white m___ f____; I'll kill another one.' However, there was some conflict regarding the person to whom the statement was directed. The appellant was found to be competent to stand trial and was discharged from the facility on December 23, 1988.

*Williams v. State*, 601 So. 2d 1062, 1065-66 (Ala. Crim. App. 1991).

B. *Procedural History*

A Tuscaloosa County, Alabama, grand jury indicted Williams for capital murder on April 29, 1988. The Honorable Joseph Colquitt appointed Al Vreeland and Bobby Cockrell Jr. to represent Williams; however, these attorneys withdrew in March 1989, and the trial court appointed John Bivens ("Bivens") to represent Williams. Bivens retained Dr. William A. Formby ("Dr. Formby") as his guilt phase investigator and hired Dr. Ray Sumrall ("Dr. Sumrall"), a licensed social worker and partner at Veritas, Inc., a firm that provides investigatory and analytical

4

services to lawyers who represent defendants in capital cases, to conduct his mitigation investigation.

Williams's trial commenced on November 27, 1989, and three days later, the jury returned a guilty verdict on the charge of capital murder. After the sentencing phase of Williams's trial, the jury recommended, by a 10-2 vote, that the trial court impose the death penalty. After weighing the aggravating[1] and mitigating circumstances,[2] the trial court followed the jury's recommendation and sentenced Williams to death.

The Alabama Court of Criminal Appeals affirmed Williams's conviction and death sentence on direct appeal. *See Williams*, 601 So. 2d at 1087. The Supreme Court of Alabama denied Williams's petition for a writ of certiorari. *See Ex parte Williams*, 662 So. 2d 929 (Ala. 1992). The United States Supreme Court denied Williams's petition for a writ of certiorari on November 2, 1992. *See Williams v. Alabama*, 506 U.S. 957, 113 S. Ct. 417 (1992). Williams then filed a Rule 32 post-conviction petition with the Tuscaloosa circuit court, raising numerous claims for

---

[1]The trial court found in aggravation that the offense was committed while Williams was under sentence of imprisonment for a previous offense, § 13A-5-49(1), Code of Alabama 1975, and that it was committed during the course of a robbery, § 13A-5-49(4), Code of Alabama 1975. [R. Vol. 7 p. 1430.]

[2]The trial court found, as nonstatutory mitigating circumstances, that Williams had an antisocial personality, that he did not have a significant prior history of assaultive or violent conduct, that he had not had a stable family environment during his formative years, and that he had extensively abused alcohol and drugs since he was about 16 years old. [R. Vol. 7 p. 1433.]

5

relief. *See* Ala. R. Crim. P. 32. Following an evidentiary hearing on the Rule 32 petition, then Tuscaloosa Circuit Judge Robert Harwood Jr.[3] denied Williams's petition for post-conviction relief. The Alabama Court of Criminal Appeals affirmed the trial court's order denying Williams's Rule 32 petition. *See Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000). The Alabama Supreme Court denied Williams's petition for a writ of certiorari.

Williams filed the present federal habeas petition on March 29, 2001, and amended his petition on June 7, 2001. The district court denied Williams's request for an evidentiary hearing and denied Williams's petition for habeas relief. Williams filed an application for a certificate of appealability ("COA") which this court initially denied. Upon reconsideration, this court granted a COA on three grounds of ineffective assistance of counsel.

## II. ISSUES

1. Whether Williams received ineffective assistance of counsel because counsel allegedly failed to review the Taylor Hardin file before trial.

2. Whether Williams received ineffective assistance of counsel at the penalty phase because his counsel allegedly failed to investigate adequately Williams's background for potential mitigation evidence.

---

[3]Today, Judge Harwood is an associate justice on the Alabama Supreme Court.

3. Whether Williams received ineffective assistance of counsel at the guilt phase because his counsel allegedly failed to investigate adequately and present substantial evidence to support Williams's reasonable doubt defense.

## III. STANDARDS OF REVIEW

We review for clear error the district court's findings of fact and review *de novo* both questions of law and mixed questions of law and fact. *Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000). An ineffective assistance of counsel claim is a mixed question of law and fact that the court reviews *de novo*. *See Rolling v. Crosby*, 438 F.3d 1296, 1299 (11th Cir. 2006), *cert. denied*, ___ S. Ct. ___ (Jun. 26, 2006). Since Williams's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we, in essence, review the decisions of the state courts. Pursuant to AEDPA

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Furthermore, a state court's factual findings are presumed

correct, unless rebutted by the petitioner with clear and convincing evidence. *Id.* at

§ 2254(e)(1).

> Under the contrary to clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. Under the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. Under either standard the appropriate measuring stick is clearly established federal law, which means the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision.

*Schwab v. Crosby*, No. 05-14253, ___ F.3d ___, 2006 WL 1642757, at *14 (No.

05-14253) (11th Cir. June 15, 2006) (internal quotations, citations, and brackets

omitted).

## IV. DISCUSSION

"It is well established that the Supreme Court's decision in *Strickland [v.*

*Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] is the

'controlling legal authority' to be applied to ineffective assistance of counsel

claims." *Marquard v. Sec'y for Dep't of Corrs.*, 429 F.3d 1278, 1304 (11th Cir.

2005), *cert. denied*, 126 S. Ct. 2356 (2006). Under this standard, in order to show

deficient performance, the petitioner must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066. The court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate, but only [on] what is constitutionally compelled." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (internal quotations omitted). The court's review of counsel's performance must be highly deferential, and the court must avoid second-guessing counsel's performance. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Further, the courts must make an objective inquiry into the reasonableness of counsel's performance. *Chandler*, 218 F.3d at 1315. There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions. *Id.* at 1317.

A. *Review of the Taylor Hardin[4] file*

Williams asserts two claims of ineffective assistance regarding his counsel's alleged review of his Taylor Hardin file. First, Williams claims that at the guilt phase, Bivens failed to read or review the file, and that this prejudiced Williams

---

[4]Taylor Hardin Secure Medical Facility is a psychiatric facility located in Tuscaloosa, Alabama, that primarily evaluates individuals in a trial status and provides treatment for the mentally ill defendant.

9

because Bivens (1) did not raise all the appropriate objections to Williams's inculpatory statement to Danny Hubbard, (2) did not introduce extenuating evidence to place Williams's words in context, and (3) failed to locate and introduce substantive evidence of chronic alcohol and drug use noted in the file that would have supported the defense theory that Williams was incapacitated at the time of the crime. Second, Williams raises a penalty phase ineffectiveness claim, arguing that Biven's failure to read and review the file prejudiced him because the file contained information that would have been useful during his presentation of mitigation evidence.

We turn first to the claim of ineffectiveness at the penalty phase. In state court, Williams did not raise a penalty phase ineffectiveness claim regarding counsel's failure to read and review the Taylor Hardin report. Rather, Williams's claim of ineffectiveness at sentencing related to counsel's failure to investigate and present sufficient mitigation evidence, albeit information Bivens allegedly could have gleaned from his reading of the Taylor Hardin report. However, the specific issue raised here was never fairly presented to the state courts. As such, the claim is precluded from federal review. *See Henry v. Dep't of Corrs.*, 197 F.3d 1361, 1366 (11th Cir. 1999) ("a petitioner's constitutional claims [must] be 'fairly presented' to the state courts such that they have 'an opportunity to apply

10

controlling legal principles to the facts bearing upon them'") (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 513, 30 L. Ed. 2d 438 (1971)).

In state court, Williams did raise at the guilt phase his claim of ineffective assistance of counsel for failure to read the report. The Alabama Court of Criminal Appeals found as follows with regard to this claim:

> Fifth, the appellant contends that his attorneys rendered ineffective assistance because they allegedly did not examine the records furnished by the State and therefore did not discover that he had made a statement to an employee at Taylor Hardin to the effect that he had killed one white man and would kill another. He also argues that counsel should have objected to the admission of the statement on the ground that it was not relevant. In addressing these contentions, the circuit court made the following findings.

>> The thrust of Williams' treatment of this contention in his post-hearing brief is that [trial counsel] erred by not interposing a relevancy objection to this testimony of Mr. Gaskin . . . .

>> Indisputably, [trial counsel] was surprised by Mr. Gaskin's testimony concerning the statement made in his presence by Williams, because neither Dr. Sumrall nor Dr. Formby had noted it or called it to his attention. Dr. Formby testified that he had gone through the records in question but 'just simply didn't pick up on it.' (EH 414).

>> The Court of Criminal Appeals analyzed the content and context of the statement attributed to Williams by Gaskin in its opinion, although it did so in connection with responding to Williams' contention that the statement should have been excluded because he had not been read his *Miranda* rights prior to making the statement.

11

Nonetheless, at the end of the entire opinion, after having addressed all issues which had been specifically raised, the court declared, '. . . We have searched the entire record for any error which may have adversely affected the appellant's substantial rights and have found none.' 601 So. 2d at 1087. As previously noted, '[a] finding of no plain error is one factor to consider when assessing the performance of trial counsel.' *Hallford v. State*, 629 So. 2d 6, 10 (Ala. Crim. App. 1992).

. . .

. . . Likewise, this court finds in this case that any deficiency in the records review, or investigation otherwise, by Dr. Formby, Dr. Sumrall, and/or [trial counsel] did not result in the requisite degree of prejudice. Unless a defendant satisfies both the deficient performance prong and the prejudice prong of *Strickland*, 'it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' *Strickland*, 466 U.S. at 687[, 104 S. Ct. 2052] . . . . [T]he court finds that there is no reasonable probability that a relevancy objection would have been sustained, nor that overruling it would have constituted reversible error. The testimony of Mr. Gaskin followed immediately after the testimony of Priscilla Jones. She had testified that when she encountered Williams at her apartment project the morning of Saturday, January 23, 1988, he had made the statement to her in the course of their conversation that he had killed a white man. (R. 479-80). When questioned further as to whether Mr. Williams had told her: 'I just killed a white man,' she confirmed that as his statement to her. (R. 502). On the heels of that testimony, Mr. Gaskin testified that Williams had stated in the course of an argument with another patient at Taylor Hardin Secure Medical Facility, in Mr. Gaskin's presence and hearing, on December 12, 1988, 'I have killed one white m___ f____; I'll kill another one.' (R.

12

515-17, 537-38). The patient with whom Williams was arguing was white and Mr. Gaskin is black. (R. 549). Mr. Gaskin recorded that statement in the 'SOAP notes' portion of Mr. Williams' record at Taylor Hardin (R. 539-43; State's Exhibit 3 at the evidentiary hearing). Williams had been arrested during the early morning hours of January 25, 1988, and had been incarcerated at various locations at all times between then and the date of the statement overheard by Mr. Gaskin. Presumably there would have been no opportunity to kill undetected a white person, or any other person, during that time frame. Accordingly, the statement made by Williams in the hearing of Gaskin would have related to an event preceding January 25, 1988. Consequently, it is not 'remote' to the January 23, 1988, incident, and statements that date to Priscilla Jones. The court finds the testimony was relevant. 'The rule is stated to be that the acts, declarations and demeanor of an accused before or after the offense whether a part of the res gestae or not are admissible against him, but unless a part of the res gestae are not admissible for him.' . . .

Accordingly, the court concludes that the statement was not objectionable on grounds of relevancy, and also concludes that the Court of Criminal Appeals would have noted it to have been thus objectionable, under the 'search the record for error' rule of review attending capital murder appeals, were that not so.

783 So. 2d at 127-29. The Alabama Court of Criminal Appeals agreed with the circuit court's findings and adopted them as part of the appellate decision. *Id.* at 129.

Assuming *arguendo* that Williams's counsel was deficient for failing to thoroughly review the Taylor Hardin file in order to prepare for a response to Mr.

13

Gaskins's testimony, Williams cannot satisfy the prejudice prong of *Strickland*.

The state trial court found that Williams could not prove prejudice because "there

is no reasonable probability that a relevancy objection would have been sustained,

nor that overruling it would have constituted reversible error." *Williams*, 783 So.

2d at 128-29. Under AEDPA, these findings are entitled to a presumption of

correctness. *See* 28 U.S.C. § 2254(e)(1). Williams cannot demonstrate that the

state courts' decisions were either contrary to, or involved an unreasonable

application of, federal law. Therefore, Williams is entitled to no relief on this

claim.[5]

B. *Failure to investigate and present sufficient mitigation evidence*

Williams contends that the Supreme Court's decision in *Wiggins v. Smith*,

539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), requires that this court

grant him habeas relief because his defense team insufficiently investigated

potential mitigation evidence to present at sentencing. Both the state trial court and

the state appellate court rejected this claim on both prongs of *Strickland*. The state

courts found as follows:

---

[5]Furthermore, Williams is not entitled to relief on his other prejudice arguments that were not raised and addressed in the state courts: (1) that Bivens was ineffective because he did not place Williams's statement "in context" at trial; and (2) that Bivens was ineffective for failing to use evidence of Williams's chronic alcohol and drug abuse to prove that Williams was incapacitated at the time of the murder. *See Henry*, 197 F.3d at 1366.

14

First, the appellant contends that his attorneys rendered ineffective assistance because they allegedly did not investigate and present sufficient mitigating evidence during the penalty phase of his trial. Specifically, he contends that counsel should have called witnesses who could have testified about his background and upbringing, including the 'personal hardships and severe deprivations' he suffered.

. . .

The record from the appellant's direct appeal shows that Dr. Raymond O. Sumrall testified before the jury during the penalty-phase proceedings. Dr. Sumrall, who was a professor at the School of Social Work at the University of Alabama and an associate professor with the University's Department of Criminal Justice, testified that he spent ten hours interviewing the appellant and that he had reviewed the appellant's background. He testified that the appellant's mother deserted him when he was very young; that he lived with his maternal grandmother; that, at age seven, when his maternal grandmother died, he moved in with his aunt; that he did not have a stable home environment; that he had not had any relationships with significant adult and stable women in his life; that he did not have a relationship with his father because his father left when the appellant was two years old; that, from the ages of nine to twelve, 'he was pretty much a street kid who came and went without very much supervision from anybody' (Trial R. 1026); that he could not discipline himself; and that he had been extensively involved in the use of drugs and other substances since he was sixteen. Dr. Sumrall also testified that he had not observed any pattern of behavior in the appellant that was assaultive or violent and that committing murder was not consistent with the appellant's prior behavior, which involved only property offenses.

There was also testimony that the appellant had been evaluated at the Taylor Hardin Secure Medical Facility ("Taylor Hardin") by several doctors. Using that evaluation, Dr. Bernard E. Bryant, a psychiatrist, testified that the appellant had an antisocial personality and that he showed remorse about the offense.

15

Finally, the trial court held a separate bench sentencing hearing after the jury had returned its recommendation and after the presentence investigation had been completed. At this hearing, Reverend Charles Hunter testified that he had known the appellant since the appellant was a child and that he was not a violent person. The appellant also testified at the hearing that he was the type of person who liked to help people and 'look out' for people. He further testified that he did not have a history of violence and that he had never previously been convicted of a violent crime.

When addressing this claim, the circuit court made the following findings:

> In his Post-Hearing Brief, Williams contends that testimony could have been adduced by defense counsel through Herbert Echols, Debra Grenshaw (spelled 'Grinshaw' in the transcript of the evidentiary hearing), Jesse Hill [the appellant's stepfather] and/or Laura Williams to paint a picture of Luther Williams' deprived and impoverished childhood. There is some question as to Mr. Echols' accessibility and availability during the period of [trial counsel's] representation of Williams, inasmuch as Mr. Echols testified at the evidentiary hearing that he was living in Detroit from 1988 to 1990, and even his brother did not really know how to find him, because at one point in time he was homeless. (EH 145). Nonetheless, the testimony elicited from him and from the other aforementioned witnesses at the evidentiary hearing related to information essentially cumulative to that provided the jury by Dr. Sumrall. Williams argues in his Post-Hearing Brief that those witnesses could have acquainted the jury with the fact that his mother had deserted him and his siblings when he was still very young; that his father likewise had abandoned him; that he thereafter was raised by Laura Wilkins; and that he was often locked out of her house and forced to fend for himself. In his testimony at the evidentiary hearing, Luther Williams explained that when Ms. Wilkins would

16

lock him out, for two to three days at a time, he would live 'over [at] other friends' houses.' (EH 189-90). The contention is made in the Post-Hearing Brief that testimony could have been presented through Mr. Echols that Luther, along with Mr. Echols, was regularly whipped by Mr. Hill with switches, belts, and extension cords. Williams himself testified at the evidentiary hearing that he had a good relationship with Mr. Hill when he didn't whip him, and Luther still loved him. (EH 190). Dr. Sumrall put before the jury that Luther Williams' 'mother deserted him at a very young age' and that he lived with a maternal grandmother for a while but that she died when he was seven, leaving Luther with an aunt who apparently adopted him when he was about nine; that 'from his birth to age nine he had no stable environment'; that he had 'no relationship with significant adult and stable women in his life'; that he had no relationship with a significant father figure in his life[]; that his father had left him when he was only two years old; and that from about nine to twelve years of age 'he was pretty much a street kid who came and went without very much supervision from anybody.' (R. 1025-26). When Williams' present counsel called Jesse Hill to the stand at the evidentiary hearing, he was not asked any questions concerning any alleged mistreatment of Luther by him. Further, Mr. Hill was asked virtually no questions at that hearing concerning Luther Williams' impoverished or deprived background, other than concerning the undisputed fact that Luther's mother and father were not involved in his life after his early years. (EH 163). With respect to the argument made in the post-hearing brief that use of a psychologist, such as Dr. Barbara Tarkin, could have paved the way for presentation of significant non-statutory mitigation evidence, the testimony she presented was not in disagreement with that of Dr. Sumrall or the State's penalty-phase expert, Dr. Bernard E. Bryant. The contention is made in the post-hearing brief that 'Dr.

17

Tarkin, or another qualified psychologist, could have offered an opinion, consistent with that of Taylor Hardin's psychiatrist, that Mr. Williams' condition was a condition that developed in all probability by virtue of his very early childhood deprivation.' (PHB, p. 17). Dr. Bryant, who testified that he was employed at Taylor Hardin from April 1 of 1986 through August 31 of 1989, opined that Williams had an antisocial personality (R. 108). He explained that it is a 'characterological or personality' disorder developed during a person's formative years, of ages '2, 3, 6, 7, 8 years old,' whereby 'the person has ended up with this personality.' (R. 1082). Dr. Bryant acknowledged during cross-examination by [trial counsel] that an unstable family could, if there were not a proper male or female role model, contribute to a person having antisocial characteristics. (R. 1097). He further acknowledged that 'substance abuse does exacerbate[.]' (R. 1098).

The court does not find that the failure to utilize the witnesses now suggested by Williams constituted ineffective assistance of counsel. . . . The pertinent information was presented to the jury through Dr. Sumrall, without the risk being run of possibly harmful information being elicited from those witnesses on cross-examination. Furthermore, even if [trial counsel's] preparation and presentation were deficient in this regard, Williams has failed to show the requisite second prong of prejudice. He has not met the *Strickland* test of showing a reasonable probability that, absent the error in question, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death; he has not shown a probability sufficient to undermine confidence in the outcome.

We agree with the circuit court's findings and adopt them as part of this opinion. In addition, we note that the trial court found, as nonstatutory mitigating circumstances, that the appellant had an

18

antisocial personality, that he did not have a significant prior history of assaultive or violent conduct, that he had not had a stable family environment during his formative years, and that he had extensively abused alcohol and drugs since he was about 16 years old. (Trial R. 1433)[.] For the above-stated reasons, the appellant has not shown that counsel rendered ineffective assistance in the preparation and presentation of mitigating evidence. *See Strickland*, supra.

*Williams v. State*, 783 So. 2d at 115-121.

Our review of this claim is limited to whether the state courts unreasonably applied *Strickland* to the facts of this case. Although Williams urges us to apply *Wiggins* to his case, the controlling Supreme Court precedent with regard to claims of ineffective assistance of counsel is *Strickland*. *See Marquard*, 429 F.3d at 1304 (noting that *Strickland* is "the 'controlling legal authority' to be applied to ineffective assistance of counsel claims"). As the district court found, the state courts did not unreasonably apply the *Strickland* standard to Williams's claim of ineffective assistance for failing to investigate and present sufficient mitigation evidence at the sentencing phase.

Bivens hired Dr. Raymond O. Sumrall ("Dr. Sumrall") to investigate and conduct his mitigation defense. Dr. Sumrall presented evidence to the jury that assisted Bivens in his mitigation strategy. Dr. Sumrall testified that Williams came from a disadvantaged background that led to his alcohol and drug abuse and property crimes, which were not violent in nature. This testimony allowed Bivens

19

to argue to the jury that Williams was not a violent person, and a sentence of life in prison would be more appropriate for him. Also, Dr. Sumrall stated that he spent ten hours with Williams, recounting his family history, educational history, and criminal history. Dr. Sumrall also reviewed Williams's mental health, police, probation, and parole records. Dr. Sumrall's testimony led the trial court to find as mitigation that Williams had a poor family history, a history of non-violent crimes, an extensive history of drug and alcohol abuse, and an anti-social personality disorder.

Assuming this investigation was deficient, Williams cannot show how the alleged deficient investigation prejudiced him at sentencing. At the Rule 32 hearing, Williams's expert psychologist, Dr. Barbara Tarkin ("Dr. Tarkin"), testified that she spent approximately nine hours meeting with Williams. She stated that she read virtually the same files as Dr. Sumrall; she talked to only one family member over the phone; and she was not "intimately familiar" with the facts of the case. [R. Vol. VI, Rule 32 hearing p. 284-91, 299, 315-17.] In her expert opinion, Dr. Tarkin found that Williams suffered from an anti-social disorder and Bivens should have argued in mitigation that Williams was suffering from a mental disturbance; that Williams was too passive to be anything but an accomplice; and that Williams was shaped by the poor environment in which he

was raised. Dr. Tarkin's conclusions are essentially the same as Dr. Sumrall's conclusions, to which he testified at sentencing.

In addition to Dr. Tarkin, Williams presented several other witnesses at the Rule 32 evidentiary hearing to testify to mitigation evidence not previously presented at trial. Herbert Echols ("Echols") testified that Williams's mother was an alcoholic, and that Williams did not know his biological father. He also stated that Williams's step-father, Jesse Hill, whipped Williams if he did something wrong, but that these whippings never required medical attention. [R. Vol. V, Rule 32 hearing p. 140-151.] Deborah Greenshaw ("Greenshaw") testified that she had known Williams since he was 16 years old. Greenshaw stated that Williams's aunt would often lock him out of her house for several days when Williams did not do what she asked. [*Id.* at 155, 160.] Jesse Hill ("Hill") testified that Williams's mother moved to New York when Williams was about ten years old, and that he only met Williams's father once or twice. No attorney asked Hill about his alleged whippings of Williams. [*Id.* at 161-68.] Laura Williams ("Laura"), Williams's sister, testified that their mother left them at an early age, and they lived with their aunt, Laura Wilkins ("Ms. Wilkins"). Laura stated that Ms. Wilkins was "always good." [*Id.* at 169-70.]

Under the prejudice prong of *Strickland*, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2068-69. Under this standard, it is apparent that "[a] petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative." *Van Poyck v. Fla. Dep't of Corrs.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002). This is exactly what happened at Williams's Rule 32 hearing. He presented evidence that was cumulative. The witnesses may have elaborated on prior mitigation evidence, but no witness testified to any new mitigating factors. Each witness presented cumulative evidence that merely re-established the mitigating circumstances previously argued by Bivens at trial and considered by the trial court at sentencing: (1) an anti-social personality disorder, (2) a non-violent criminal history, (3) an unstable family life, and (4) an extensive alcohol and drug abuse problem. There can be no reasonable probability that this cumulative testimony of mitigating factors already presented to and considered by the trial court to be "weak and unpersuasive" would have tipped the sentencing scales, especially when the trial court noted that the statutory aggravators far outweighed the mitigating factors. [R. Vol. 7 p. 1427.] Thus, Williams cannot

22

demonstrate that the state courts' determination that he failed to prove prejudice under *Strickland* was objectively unreasonable. Accordingly, Williams is not entitled to relief on this claim of ineffective assistance of counsel at sentencing.

C. *Failure to investigate adequately the guilt phase defenses*

Williams argues that his counsel rendered ineffective assistance because he did not reasonably investigate Williams's guilt phase defenses that he was incapacitated at the time of the murder, and that there was "reasonable doubt" that Williams committed the murder because there were two other individuals involved. Both the state trial court and appellate court rejected Williams's claim under *Strickland*. *See Williams*, 783 So. 2d at 123-26. Specifically, both courts found that Dr. Formby was a well qualified investigator who reasonably investigated Williams's guilt phase case, and that Williams presented no evidence at the Rule 32 hearing that would have affected the outcome of the trial. *Id.*

The Alabama Court of Criminal Appeals stated the following:

First, the appellant contends that his attorneys rendered ineffective assistance because they allegedly did not properly investigate the case and interview potential witnesses. The circuit court made the following findings concerning this contention:

[Trial counsel] principally relied on Dr. Formby, who had been engaged by his predecessor counsel, to conduct the case investigation and witness interviews. Dr. Formby was well qualified for that role by virtue of many background attributes, as detailed by his testimony at the

23

evidentiary hearing and his 'vitae' introduced as State's Exhibit 6 to the same. During the time of his engagement on the case, he was also a co-principal with Dr. Sumrall in the forensic services firm of Veritas, Inc. . . . Dr. Formby testified that he 'probably put in easily 200 hours' on the investigation, having commenced it in the service of [Williams's] predecessor attorneys and therefore having been on the case 'essentially longer than anybody else.' (EH 398). Dr. Formby 'spent a good bit of time talking with Luther [Williams]' and spent a good bit of time talking to potential witnesses in the Smithfield Apartments area of Birmingham. (EH 378). He visited with some of Williams' family members in the Titusville projects and Debra Bush in the Avondale projects. (EH 378). He went to see Margie Bush, the grandmother of Debra Bush and she admitted him to her apartment where Luther had been apprehended, showing him the bedroom. Dr. Formby spent many hours 'just walking around that area talking to people.' (EH 380). For various reasons adequately explained in his testimony, he did not keep detailed records of everyone he interviewed or of all the time he devoted to the case. He interviewed Priscilla Jones and DeWayne Pierce. (EH 382-83). A lot of his investigation and interviewing was devoted to trying to develop connections between Williams' co-defendants and the property stolen from Mr. Kirk, and other evidence against the co-defendants. (EH 381, 384). He went to the Titusville projects and spent approximately two hours interviewing Williams' grandmother and one of his sisters. (EH 384) . . . . As the District Attorney's office provided the defense with more and more discovery materials, Dr. Formby 'would go back to Luther and talk to him again to see if he could push me or give me leads in other directions.' He talked to Williams a lot. (EH 388). Dr. Formby went to the crime scene on a couple of occasions. (EH 388-89). He attempted to follow the route that Williams and his two co-defendants had traversed at different points during the incidents in

24

question. (EH 389). He and [trial counsel] routinely 'would have meetings probably twice a week up until the last few weeks before trial, and then we met virtually every day.' (EH 389-90). Dr. Formby would brief [trial counsel] on all that he had developed, and [trial counsel] would provide guidance in terms of things that he felt were important that Dr. Formby needed to follow up on. (EH 390). . . . For his part, [trial counsel] personally tried to locate witnesses who could corroborate Mr. Williams' claim that he was incapacitated by intoxication on the night of the murder[.] (EH 79-80).

The appellant also contends that his attorneys rendered ineffective assistance because they did not interview and present witnesses who he alleges could have rebutted most of the circumstantial evidence presented in the case. Specifically, he asserts that there were witnesses who could have placed his codefendant in the victim's truck on the day of the murder and who could have impeached Priscilla Jones, the appellant's sister, who testified that the appellant told her that he had killed a white man. In regard to this issue, the circuit court made the following findings:

Williams argues in his Post-Hearing Brief that [t]o counter the damaging evidence that Mr. Williams was seen driving Mr. Kirk's truck, trial counsel could have offered testimony through Laura Williams or Sandra King that Albert Carmichael had been seen driving the red truck, that he smelled of gasoline and that Mr. Carmichael had white man's cigarettes on him Saturday evening, just hours after Mr. Kirk was murdered. (PHB, p. 12). Ms. Williams and Ms. King testified at the evidentiary hearing that they were at Ms. King's apartment house on a Saturday night when they observed Albert Carmichael in a red truck parked in the parking lot by Priscilla Jones' house. As far as the date on which that occurred, Ms. Williams was only asked if she remembered being at Ms. Kings' 'a few days before the time that Luther was arrested for the murder,' and she

25

identified it as a Saturday night, and Ms. King was asked if she could remember being at home with Laura visiting her 'January 23, I believe a Saturday night, Saturday afternoon or Saturday night. I may be wrong on the day, but I think that is the date, January 23. Do you remember being home on that date?', to which she answered in the affirmative. (EH 181). Both testified that Carmichael came into King's apartment and they were then able to notice the smell of gasoline on him. Ms. Williams testified that he 'had some cigarettes that he didn't smoke,' which were 'a white man's kind of cigarettes.' Asked what brand they were, she testified that they were 'Merit or something like that. I can't really remember what kind they were,' whereas Carmichael usually smoked Kools. Ms. King testified that Carmichael usually smoked 'Kools or either Newport 100s' and that the cigarettes he had with him on the occasion in question were not 'the same kind' but she could not state what brand they were. (EH 175-76, 183-84).

. . . .

Considering all of the interviewing of Williams and his family members conducted by Dr. Formby, and considering all of the evidence showing the involvement of Albert Carmichael and Trosky Gregory in various critical events of the weekend in question, the court does not find that Williams has carried his burden of proving that a failure to use Laura Williams or Sandra King as defense witnesses constituted ineffective assistance of counsel; or that the omission of their testimony prejudiced the defense in the way required by the *Strickland* test. Under *Strickland*, it is not enough to show that trial errors 'had some conceivable effect on the outcome of the proceeding,' rather the defendant 'must show that there is a reasonable probability that, *but for* counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland*, 466

U.S. at 693-94 . . . . (Emphasis added). That Albert Carmichael was observed in the red camper truck at the apartment complex during the night of Saturday, January 23rd, after Luther Williams had been observed to have been involved with it at earlier points in time that day, would not have altered the impact or implication of any of the State's critical evidence. There is no indication that either Laura Williams or Sandra King ever told anyone before Williams' trial that they had seen Albert Carmichael in the red truck. . . .

Williams asserts in his post-hearing brief that defense counsel should have countered the damaging testimony of Priscilla Jones by eliciting testimony from her father, Jesse Hill, that she was 'a big liar.' Under Rule 608(a) of the Alabama Rules of Evidence . . ., a witness may impeach the credibility of a witness who has testified by offering the second witness's opinion regarding the first witness's untruthfulness. The Alabama Rules of Evidence did not become effective until January 1, 1996, however, and the law of evidence existing at the time of Williams' trial restricted the testimony of an impeaching witness to the limited fact of the other witness' general reputation in the community for untruthfulness. Before a witness can testify concerning the reputation in the community for the truthfulness or untruthfulness of another witness, a predicate must be laid establishing that the impeaching witness actually has knowledge of the other witness's reputation for truthfulness or untruthfulness in the first witness's community. That was the evidentiary point addressed by the court in its comments to counsel during Mr. Hill's testimony. (EH 164-66). Although the question put to Mr. Hill was rephrased so as to properly inquire as to 'reputation,' Mr. Hill persisted in expressing the matter in terms of his own personal knowledge of her lack of veracity. His testimony as ultimately offered related to his own personal assessment or opinion of her history of

untruthfulness, rather than relating it to her reputation in the community. He expressed his opinion that Priscilla 'had come down here and told the people out here a bunch of – to me, it is a bunch of fairy tales.' (EH 166). Mr. Hill conceded, however, that he [had] no knowledge about the evidence in the case and that it was his testimony that Priscilla was telling the people in Tuscaloosa 'fairy tales' because 'that is my daughter, and I know what she is capable of doing. My daughter would do anything, say anything to anybody.' (EH 167). When asked how, if he did not know anything about the facts of the case, he could attack the credibility of her testimony, he answered that Priscilla was 'a big liar,' and that she 'never tells the truth about a lot of things.' (EH 168). Accordingly, as the record stands, there is no affirmative showing that Mr. Hill could have offered testimony that would meet the foundational requirement of showing that it related to Priscilla Jones' reputation for truthfulness/untruthfulness in her community in 1989. . . . [Trial counsel] impeached Priscilla Jones with respect to the inconsistencies between her trial testimony and her preliminary hearing testimony, and her testimony on several important points was corroborated by that of Teresa Ann Evans. One of the critical features of Priscilla Jones' testimony was that Luther Williams told her, on the occasion that he came to her apartment building the morning of Saturday, January 23rd, in the 'red and white camper truck,' that he had killed a white man (R.479), that 'I just killed a white man.' (R.502). She did not believe him at the time. (R.480, 502). Immediately prior to making that statement, he had hugged her and apologized to her for the altercation between them the preceding night. (R.476, 502). He had the odor of gas on him. (R.480). When she returned to her apartment, he followed her and showed her 'a pistol and some bullets,' with the pistol having 'a clear handle,' meaning that it was 'white.' (R.480). As the only other participant to that conversation, Williams was the only

person who could have contradicted Jones' testimony about it, but he did not testify and the trial strategy decision in that regard is not challenged in this proceeding. The court does not consider the fact that Mr. Hill might have testified that he had knowledge of his daughter's reputation for truthfulness, and that her reputation was bad in that regard and she had a reputation for untruthfulness, would have been of such import as to impeach her as a witness to the extent that the outcome of the trial would have been different.

We agree with the circuit court's findings as to these claims and adopt them as part of this opinion. Because the appellant has not established that his attorneys rendered ineffective assistance in these instances, he is not entitled to relief on these claims. *See Strickland*, supra.

*Williams*, 783 So. 2d at 123-26.

As the state courts found and the record reflects, Bivens and Formby reasonably investigated both theories of defense. Bivens testified at the Rule 32 hearing that the incapacitation theory of defense "probably" came from Williams. [R. Vol. IV, Rule 32 hearing p. 63-64.] Bivens attempted to find information that could prove or support the incapacitation theory, but was unable to do so. [*Id.* at 30, 80-81.] Once he could not find anything to support the incapacitation theory, Bivens was left with a "reasonable doubt defense" – attacking the State's case that Williams committed the murder through "innuendos and assumptions." [*Id.* at 62-63.]

29

Dr. Formby testified that his primary goal was to find any evidence that would develop stronger connections between the other individuals involved in the murder and the actual murder. Like Bivens, Dr. Formby twice traveled to the murder scene to see if any argument could be made concerning the trajectory of the bullet. [R. Vol. VI, Rule 32 hearing p. 25-26, 388.] He also followed the same route Williams and the other individuals took the day of the murder, and he viewed the videotaped statements of the other individuals to search for anything exculpatory to Williams. [*Id.* at 389, 416-17.] Dr. Formby also visited the Smithfield project several times to talk with people in the area and to interview Williams's family members. [*Id.* at 382-84.] He also viewed the scene of the arrest and interviewed the women who were present at the time of Williams's arrest. [*Id.* at 384.] Moreover, when Williams's initial trial attorneys received a letter from a former client claiming that one of the other individuals involved admitted to committing the murder, Dr. Formby investigated that lead and found the letter to be false. [*Id.* at 379.] When Wallace Gaskin testified concerning Williams's inculpatory statement to Danny Hubbard, Dr. Formby traveled to Taylor Hardin to search for Danny Hubbard. [*Id.* at 392.] In addition, Bivens testified that he reviewed the entire State's file, viewed the State's physical evidence, and reviewed the Taylor Hardin reports to determine whether some type

30

of mental health defense was possible. [R. Vol. IV, Rule 32 hearing p. 14-16, 19, 20, 37-39, 66.]

Based on the record, the state courts correctly found that Bivens and Dr. Formby performed a reasonable investigation of Williams's case and possible defenses. These findings are entitled to a presumption of correctness by our court. *See* 28 U.S.C. § 2254(e)(1). Williams presents nothing to rebut these findings. Therefore, Williams cannot show that the state courts unreasonably applied *Strickland*'s performance prong to this issue.

Assuming *arguendo* that Williams could show that his counsel was deficient for not thoroughly investigating his potential defenses for trial, he cannot show that any deficient performance prejudiced his defense. At the Rule 32 hearing, Williams presented the testimonies of Sandra King ("King") and Laura Williams, both of whom testified to seeing another individual involved in the case driving Mr. Kirk's red truck on the night of the murder and smoking a "white man's" cigarette. [R. Vol. V, Rule 32 hearing p. 168-185.] As the state court noted, this testimony "would not have altered the impact or implication of any of the State's critical evidence." *Williams*, 783 So. 2d at 125. Nothing in these testimonies refutes the fact that Williams was seen driving the truck alone shortly after the murder and leaving in the truck later that same day. [R. Vol. 3, Trial transcript p.

31

457-61.] Williams also presented the testimony of Jesse Hill who testified that Priscilla Jones, a trial witness, was a "big liar" and told "fairy tales" during the trial. [R. Vol. V, Rule 32 hearing, p. 166-68.] However, Hill could not testify that he had knowledge of Jones's general reputation for truthfulness in the community, which was the standard of admissibility in Alabama at the time of Williams's trial. *See Williams*, 783 So. 2d at 125-26. Rather, Hill's testimony was based on his personal opinion. Moreover, Hill admitted that he had no knowledge of the circumstances of the case. [*Id.* at 167.]

Williams cannot show that "there is a reasonable probability that the outcome of the proceeding would have been different," *Callahan v. Campbell*, 427 F.3d 897, 936 (11th Cir. 2005), *pet. for cert. filed*, (No. 05-10404) (Apr. 13, 2006), by adding two witnesses who corroborate the State's theory and another witness who has no knowledge of the circumstances of the case and can only present inadmissible opinion testimony. Thus, Williams cannot demonstrate prejudice under *Strickland*. Accordingly, Williams cannot show that the state courts unreasonably applied *Strickland*'s prejudice prong in his case, and, therefore, he is not entitled to habeas relief.

## V. CONCLUSION

Because Williams fails to demonstrate that the state courts unreasonably applied the *Strickland* standard to his claims of ineffective assistance of counsel, we affirm the district court's judgment denying Williams habeas relief.

AFFIRMED.

BARKETT, Circuit Judge, concurring:

I concur because the majority opinion correctly resolves the legal issues before us. Williams argues that his trial counsel was ineffective by failing to read the Taylor Hardin file, in which he would have discovered the basis for Gaskin's unequivocally damaging testimony — viz., that Williams told Gaskin that he killed a white man — and would have been able to object to the testimony on relevancy grounds. Given the proceedings in the Alabama state courts, Williams cannot satisfy the prejudice prong of Strickland on the strength of the relevancy objection alone, see Ante at 14 n.5, and that is the only issue, with respect to the guilt-phase, for our review.

I write separately only to note that Williams has not argued in the state courts that counsel should have been better prepared to mount an adequate defense notwithstanding the success vel non of the objection to Gaskin's testimony. For example, had counsel known of Williams' inculpatory statement, he most certainly would have discussed it with Williams and attempted to ascertain the circumstances under which the statement was made, the purposes for which it was made, and any other information that might have mitigated the statement. See

<u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).[1] Because our review is limited, however,

to the grounds identified by the majority, I must concur.

---

[1] Contrary to the state's argument on appeal, <u>Rompilla</u> and <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), although they post-dated the relevant state-court proceedings, <u>are</u> relevant to our consideration of Williams's <u>Strickland</u> claim, for they both clarify <u>Strickland</u>'s applicability. <u>See, e.g.</u>, <u>Wiggins</u>, 539 U.S. at 521 ("While <u>Williams</u> [<u>v. Taylor</u>, 529 U.S. 362 (2000)] had not yet been decided at the time the Maryland Court of Appeals rendered the decision at issue in this case, Williams' case was before us on habeas review. Contrary to the dissent's contention, we therefore made no new law in resolving Williams' ineffectiveness claim. In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same "clearly established" precedent of <u>Strickland</u> we apply today."). I do not take our decision in this case as holding to the contrary.